Ferron W. SONDEREGGER et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF the INTERIOR, an agency of the United States of America, Defendant.

Civ. No. 4–76–63.

United States District Court, D. Idaho.

Dec. 17, 1976.

Rigby, Thatcher & Andrus, P. A., Rexburg, Idaho, for plaintiffs.

Rex E. Lee, Asst. Atty. Gen., Jeffrey Axelrad, Paul F. Figley, Attys., Civ. Div., U. S. Dept. of Justice, Washington, D. C., Wilbur T. Nelson, U. S. Atty., Boise, Idaho, for defendant.

## MEMORANDUM DECISION

CALLISTER, District Judge.

The Associated Press and *The Idaho Statesman* pursued a request, and appeal, with the United States Department of the Interior to obtain disclosure of the claim file of each victim of the Teton Dam disaster. The Department of the Interior announced that commencing on or about November 1, 1976, the periodic release of the following information would begin: (1) claimant's name, (2) the amount claimed, (3) the amount paid to the claimant, and (4) the category for which the payment occurred.

Plaintiffs seek an injunction barring the United States Department of the Interior from making public the four enumerated categories of information which they contend are exempt from disclosure under the Freedom of Information Act as personal information that would constitute a clearly unwarranted invasion of personal privacy, 5 U.S.C. § 552(b)(6), or would constitute commercial or financial information which is exempt from disclosure under 5 U.S.C. § 552(b)(4). The Plaintiffs contend they have an implied right under the Freedom of Information Act to block disclosure of exempt information and that the Privacy Act, 5 U.S.C. § 552(a), prevents disclosure of information which is exempt from disclosure under the Freedom of Information Act.

An evidentiary hearing was held in Pocatello, Idaho, on November 19, 1976, to make a threshold determination whether or not the Plaintiffs had a cause of action.

In a direct action *Theriault v. United States*, 503 F.2d 390 (9th Cir. 1974), held that a claim of exemption be predicated upon the court's finding of fact following a full *de novo* hearing. This required a ". . . judicious weighing of the complainant's need for and entitlement to production as against the government's or another's right to protection."

In *Epstein v. Resor*, 421 F.2d 930 (9th Cir. 1970), cert. den., 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549, the Government argued that the determination of whether a matter falls within an exemption is a matter within agency discretion which precludes a broad judicial review. This argument was rejected with the court ruling that a *de novo* hearing was required to determine applicability of an exemption.

In a reverse Freedom of Information Act action the courts have held that a *de novo* hearing is required to determine the applicability of an exemption. Illustrative of this determination is *Westinghouse Electric Corporation v. Schlesinger*, 392 F.Supp. 1246, at 1250 (E.D.Va.1974):

"The FOIA cannot permit agency discretion to the extent that such discretion precludes *de novo* determination by a court of the entitlement to an exemption under FOIA."

A careful analysis of *Charles River Park A, Inc. v. Department of Housing and Urban Development*, 171 U.S.App.D.C. 286, 519 F.2d 935 (1975) shows support for a *de novo* hearing.

On remand the district court should hear evidence relevant to the issue of whether the information, claimed to be exempt under Exemption 4, was confidential by either impairing the Government's ability to obtain necessary information in the future or by causing substantial harm to the competitive position of the person from whom the information was obtained. Quoting in full footnote 4 at 940–941:

"The hearing on this issue would not be a de novo evidentiary hearing on the facts constituting the basis for the agency's decision. Such a hearing would not, of course, be appropriate under *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

"A plaintiff in a suit such as this is obviously entitled to no relief if the government could be forced to disclose the information it wishes to reveal in a suit under the FOIA. Thus, the district court should hold a hearing to determine whether the information involved here would have been exempt just as it would if a suit had been brought under the FOIA to compel disclosure. See 5 U.S.C. § 552(b)(3); *National Parks & Conservation Assn. v.*

*Morton, supra* [162 U.S.App.D.C. 223, 498 F.2d 765]. In holding this hearing the district court is not reviewing agency action; it is making a threshhold determination whether the plaintiff has any cause of action at all."

Saturday, June 5, 1976, the Teton Dam breached and a torrent of water surged through the opening. The churning water, several miles in width, formed a tremendous tidal wave which raged over the Upper Snake River Valley Plain, engulfing small farming communities.

Directly in the path of the cascade, the small communities of Wilford and Sugar City were totally devastated. Rexburg and several other communities downstream received extensive, if not total destruction from the deluge.

Homes and buildings were torn from their foundations; trees toppled, rich dark farmland was superimposed with boulders, silt, and debris, and business houses were annihilated.

The inundated counties of Fremont, Madison, Bonneville, Bingham and Jefferson were declared a national disaster area by President Ford.

The sudden disaster was measured in Biblical proportions.

In its wake, the flood left ravaged communities composed for the most part of closely-knit friends, relatives, and neighbors.

The residents of Sugar City (population 600), Wilford (population less than 200) and similar communities were left in the hopeless position of obtaining food, clothing and shelter. Of noticeable effect on the communities was the massive relief program of the Church of Jesus Christ of Latter-day Saints. Rick College, a small church-owned school, provided thousands of victims with shelter, clothing and medical assistance; 30,000 meals a day at the peak of the disaster; and housed federal disaster relief groups. Churches and the Red Cross, in conjunction with City, County, State and Federal agencies gave supportive aid to the victims as they struggled to again unify and rehabilitate their communities.

As catastrophic as the disaster had been, the hopelessness, struggle and confusion of the aftermath were the flood's equal. There were many decisions to be made and the victims received advice from a multitude of different people; they were in a quandary. Day by day the people worked out their problems and struggled to rehabilitate their houses only oftentimes to find that after they had cleaned them up and fixed them, the walls and foundations would begin to crumble.

The small agrarian communities were often naive to spurious claims of foreign opportunists. Outside looters converged on the communities causing State Police to throw up barriers and keep people out of the area. Following the looters came the "fast-buck artists" promising goods and materials, then failing to deliver them.

Notwithstanding the many intrusions, the victims' hard work and close interaction with disaster agencies has unified the communities.

The victims, relying on each other out of necessity, have laid a foundation of trust and confidence in their interactions with those similarly situated.

The Teton Dam Disaster Assistance Act of 1976 was enacted by Congress August 25, 1976. President Ford signed the bill on September 7, 1976, Pub.L. 94-400, 90 Stat. 1211. The purpose of the Teton Dam Disaster Assistance Act is to provide for application and settlement of claims for death, personal injury and property damage resulting from the failure of the Teton Dam on June 5, 1976. An extensive procedure for processing claims has been established by the Bureau of Reclamation, Department of the Interior. The policy of the Department is to provide for the expeditious determination of meritorious claims under the Act.

Filing occurs when a Claims Officer receives from claimant an executed form accompanied by a request for money damages in a "sum certain" for injury to or loss of

property, for personal injury or for death alleged to have occurred as a result of the Teton Dam failure.

All claims must be made in a "sum certain" before processing can begin. The burden of proof on all claims is on the claimant. The Claims Officer, who is the first checkpoint, receives the "sum certain" from the claimant and makes appropriate adjustments if needed. All claims are subject to decreasing, but not increasing adjustments by the Government at each of four verifying checkpoints in the claims process.

The claim is next assigned to a loss verifier who makes an independent fact-finding investigation of damage or injury on behalf of the Government and submits a written report. This investigation is carried out by the Small Business Administration, Farmers Home Administration, and the Bureau of Reclamation. At any point in this investigation the government agencies can require the Federal Bureau of Investigation to investigate possible fraud.

A written report is returned to the Claims Officer who again investigates and forwards the claim to a Review Team. The Review Team is composed of appraisers, engineers, economists, contract specialists and other verifiers as deemed necessary. The Review Team drafts a summary and analysis, makes adjustments, if necessary, and after a thorough investigation, returns the claim to the Claims Officer.

The Claims Officer is to insure that the investigation is conducted in a fair and impartial manner. He also insures that property damage is inspected; signed statements obtained from competent witnesses; injured persons are personally interviewed; insures all necessary bills and estimates are obtained; and prepares the investigative report. The report contains all pertinent statements, exhibits and any other evidence taken or considered in the investigation.

This report is forwarded to an authorized officer (an attorney for the Department of the Interior) who makes a determination of the claim. Any additional information may be requested by the authorized officer. The officer may deny the claim or pay the claim in part or in full. Amendments are not allowed after adjudication by the authorized officer.

The claim determination and a voucher are forwarded to claimant with a release.

Reconsideration, usually based on new evidence, is referred to the Office of Hearings and Appeals in the Department of the Interior for final decision.

Under this procedure of filing a "sum certain" total for damage to farm land, the claimant may file to the outside limit of land damage and this provision will be deferred until an expert can make a final determination of the damage. The farmer files a "ball park" figure that he will accept and then relies on the following agencies for help: The Agricultural Stabilization and Conservation Service (ASCS) works in cooperation with farmers to determine value of land damage and to control "rip-off" contractors from using Government money fraudulently. The Soil Conservation Service (SCS) supplies technical engineering services to determine damage to irrigation systems, structures, etc. Farmers Home Administration is also available. This type of appraisal, testing and verification often results in a substantial passage of time. Therefore, the claimant is allowed to file prior to the official determination of land damage, knowing that the claim could be paid in full or an adjustment made later.

A farmer could properly file a "sum certain" total for land damage at $50,000 based on the outside limit of land damage. Upon a proper future determination of damage the Bureau could allow the claim to remain at $50,000, or through appraisal inform the farmer that the land can be salvaged to 10% of claimed damage. Whereupon $5,000 would be tendered to the farmer, notwithstanding his amount claimed would remain at $50,000. Such discrepancies as to proper amount claimed and amount paid are misleading.

The exhibit attached hereto for illustrative purposes shows the procedure for filing the claim.

No claims can be determined exactly. Education, training, ability, and experience are all factors which are used to determine amounts of claims. An identical object viewed through the eyes of another would more than likely be appraised at a different value. Actual determination of property damage is almost impossible. Difficulty lies in recall of small items of personal property and the amount of value attached thereto.

Having lost so many things such as personal mementos, records, books, photographs, family heirlooms, memorabilia and irreplaceable objects, determination of a proper and fair claim is at best nearly impossible. Naturally there will be substantial variance between claims because different people have paid different amounts for their clothes; they have different numbers of suits and dresses; and two people that, on the surface, appear to be equal or in a similar circumstance may vary substantially. Assuming all claims were made in good faith, each claim, through the eyes of another with a similar background, would be viewed differently. The Government makes allowance for difference in amounts so long as settlement results in a fashion that is fair for the Government and the victims.

■ Earlier this year the Supreme Court discussed the basic thrust of the Freedom of Information Act:

"Congress . . . structured a revision whose basic purpose reflected 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.' S.Rep.No.813, 89th Cong., 1st Sess., at 3 (1965) . . . . To make crystal clear the congressional objective . . . Congress provided in § 552(c) that nothing in the Act should be read to 'authorize withholding of information or limit the availability of records to the public, except as specifically stated . . . .' Consistently with that objective, the Act repeatedly states 'that official information shall be made available "to the public," "for public inspection." ' [Environmental Protection Agency v.] Mink, [410 U.S. 73 (1973)] at 79, 93 S.Ct. [827] at 832, 35 L.Ed.2d [119], at 128. There are, however, exemptions from compelled disclosure. They are nine in number and set forth in § 552(b). But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act. 'These exemptions are explicitly made exclusive, 5 U.S.C. § 552(c) . . . .' " [Department of Air Force v. Rose, 425 U.S. 352, 96 S.Ct. 1592 at 1599, 48 L.Ed.2d 11 (1976)]

Thus, unless one of the specific exemptions set forth in 5 U.S.C. § 552(b) is applicable, the information, at issue must be disclosed.

■ A leading case on Exemption 4 is *National Parks and Conservation Association v. Morton*, 162 U.S.App.D.C. 223, 498 F.2d 765 (1974). Under *National Parks*, matters were within the commercial or financial exception if the information was shown to be (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential. There is apparently no question that information submitted by Plaintiffs in this action to the Bureau of Reclamation is of commercial or financial nature. There also is apparently no question that the information presently lodged in the Bureau's files was obtained from the Plaintiffs and not from some federal agency. Hence, the first two categories of Exemption 4 are met.

A contention that the information was not obtained from a person is not valid.

The amount of a claim is information furnished by a person as his evaluation of his total flood damage. That information is furnished to assist the claims evaluation as required by the congressional mandate of making full compensation to flood victims.

If material submitted to the Bureau of Reclamation is classified as privileged or confidential under Exemption 4, then that material might not be subject to disclosure. The issue turns on what information is deemed privileged or confidential.

An examination of the Senate Report for historical background of Exemption 4 reveals, in part:

"This exception is necessary to protect the confidentiality of information which is obtained by the Government through questionnaires or other inquiries, but which would customarily not be released to the public by the person from whom it was obtained." S.Rep.No.813, 89th Cong., 2d Sess. 9 (1964)

The House Report that deals with Freedom of Information Act, Exemption 4 construes the Act relative to

" . . . information which is given to an agency in confidence, since a citizen must be able to confide in his Government. Moreover, where the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations." H.Rep.No.1497, 89th Cong., 2d Sess. 10 (1964)

Under *National Parks* the question of what financial information pursuant to the Freedom of Information Act, Exemption 4, is to be deemed confidential and hence not subject to disclosure was presented:

"The 'financial information' exemption recognizes the need of government policymakers to have access to commercial and financial data. Unless persons having necessary information can be assured that it will remain confidential, they may decline to cooperate with officials and the ability of the Government to make intelligent, well informed decisions will be impaired. This concern finds expression in the legislative history as well as the case law."

There is no argument in the instant case that the Government's ability to properly decide on fair and just amounts for loss recompense would be severely impaired if financial information concerning the flood victims was not available for governmental scrutiny. Neither independent information nor analysis of data previously existing in the Bureau of Reclamation's files has been made. The documents requested contained the same personal and confidential financial information originally submitted to the Bureau of Reclamation. Indeed, if it were not for the breach of the Teton Dam, the claimants would not have a capsulized picture of their personal balance sheets, income statements, net worth statements and other financial information sought to be publicly disclosed.

■ Under *National Parks* the court concluded that a commercial matter is confidential if disclosure would either (1) impair the Government's ability to obtain necessary information in the future, or (2) cause substantial harm to the competitive position of the person from whom the information was obtained. As the Interior Department is willing to disclose information, it might be argued that there would be no governmental impairment. Assuming, *arguendo*, that there would be no impairment of governmental functions, the Plaintiffs' claims for exemption, then, rest on their establishing that disclosure will result in substantial competitive harm. One area of concern is the traditional basis of furnishing financial information to a competitor which would enable the competitor to do harm.

The Government contends that this test should not apply since only a "bottom-line figure" would be disclosed.

Testimony at the hearing, which was uncontroverted by the Government, showed that substantial harm could occur with the disclosure of "bottom-line figures." In *Burroughs Corporation v. Schlesinger*, 403 F.Supp. 633 (E.D.Va.1975), so called "bottom-line figure" was claimed exempt under Exemption 4. The court held that a further evidentiary hearing was necessary, implying that a simple "bottom-line figure," through disclosure, could do substantial competitive harm.

When any other information is added it would accentuate the harm. It is apparent that in our highly technological society, release of the four categories of information would give a substantial advantage to competitors and do considerable harm to the claimant. Testimony to this effect was shown by the Attorney General's consumer

complaint division. In view of the uncontroverted evidence presented by the consumer complaint division, it is evident that publication of names, coupled with further disclosure of amounts and nature of claims, would increase the danger.

A second type of competitive harm is possible due to the nature and make-up of the small communities involved in the flood. A competitor having access to the four categories of information could compete for customers by implying charges were too high, overhead too high, business not needed, and otherwise using the information to damage the claimant.

Discrepancy between amount claimed and amount paid, while perfectly consistent with the claim procedure and honesty of the claimant, could infer that claimant was not honest in business. Again, the nature of the communities must be evaluated. Furthermore, forcing a claimant to disclose all the details of his claim to defend his integrity is an unwarranted invasion of privacy.

The Defendant's argument that necessary information in implementing the Teton Dam Disaster Assistance Act be presented to the Government has substantial merit. In order to survive financially the claimants are required to file their claims. The Government is, however, able to obtain necessary information because claimants have a financial interest in presenting information to the Government to justify their claims, but this disclosure falls short of total public disclosure of all four enumerated categories.

Evidence shows that affirmative representations were made to flood victims that information provided to the Bureau of Reclamation would be kept in strictest confidence.

The Government affirms these representations by stating in their brief: " . . . there was a general understanding that information provided to defendant in support of a claim would be held in confidence" but argues that such a promise is without legal effect. The Government cites *Petkas v. Staats*, 163 U.S.App.D.C. 327, 501 F.2d 887 at 889–890 (1974):

"Nor can a promise of confidentiality in and of itself defeat the right of disclosure." (citing cases)

This Court bases no decision of non-disclosure on the promise of confidentiality in and of itself but views the affirmation of confidentiality as one of many factors in the total process. Even if the Court were satisfied that the claimant viewed the data as confidential at the time it was submitted, this alone, of course, is not solely determinative of the issue as regulations must be consistent with the mandates of the Freedom of Information Act.

Exemption 6 provides that disclosure is unnecessary if the matters are "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

The legislative history of Exemption 6 can only be read as disclosing a congressional purpose to eschew a blanket exemption.

Indeed, H.R.Rep.No.1497, at 11, states: "The limitation of a 'clearly unwarranted invasion of personal privacy' provides a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information by excluding those kinds of files the disclosure of which might harm the individual."

The Senate Report, S.Rep.No.813, at 9, states:

"The phrase 'clearly unwarranted invasion of personal privacy' enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information."

The Report states further (ibid):

"At the same time that a broad philosophy of 'freedom of information' is enacted into law, it is necessary to protect certain equally important rights of privacy with respect to certain information in Government files, such as medical and personnel records. . . ."

"It is not an easy task to balance the opposing interests, but it is not an impossible one either. It is not necessary to conclude that to protect one of the interests, the other must, of necessity, either be abrogated or substantially subordinated. Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure."

*Department of Air Force v. Rose* states: " . . . § 552(b) now provides that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.' Pub.L. 93–502, § 2(c), 88 Stat. 1561, 1564. And § 552(a)(4)(B) was added explicitly to authorize *in camera* inspection of matter claimed to be exempt 'to determine whether such records *or any part* thereof shall be withheld.' Pub.L. 93–502, § 1(b)(2)(B), 88 Stat., at 1562 (emphasis supplied.)."

Senator Kennedy made the matter even clearer in his remarks:

"For example, deletion of names and identifying characteristics of individuals would in some cases serve the underlying purpose of exemption 6, which exempts 'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.'" 120 Cong.Rec.S. 9315 (daily ed. May 30, 1974)

It is clear from the Committee Reports that the primary concern of Congress in drafting Exemption 6 was to provide confidentiality of personal matters contained in files maintained by the Veteran's Administration; Department of Health, Education, and Welfare; and the Selective Service. Nevertheless, these files were subject to mandatory disclosure in redacted form if personal privacy could be sufficiently protected.

House Report states, H.R.Rep.No.1497, at 11:

"The exemption is also intended to cover detailed Government records on an individual which can be identified as applying to that individual and not the facts concerning the award of a pension or benefit or the compilation of unidentified statistical information from personal records."

Similarly, the Senate Report, states, S.Rep.No.813, at 9:

"For example, health, welfare, and selective service records are highly personal to the person involved yet facts concerning the award of a pension or benefit should be disclosed to the public."

Public Law 94–400, Section 8, mandates an annual report to the Congress submitted by the Secretary of the Interior at the end of each year and thereafter until completion of the claims program. The Government argues that submission of this annual report to Congress shows congressional intent for public disclosure. While it is true that Congress has specifically requested that this information be given to them at the end of each year, it has not determined that this information should in any way be made public. On the contrary, there are members of Congress who feel that this kind of information should never be made public. In any event, that is a question for Congress to decide.

Of interest is the Bureau of Reclamation's finding in a letter from Stanley Doremus, Deputy Assistant Secretary, to the Associated Press and *The Idaho Statesman*, filed October 6, 1976. Quoting, in part, page 2:

"The officials of the Bureau of Reclamation felt they had sound grounds in invoking the exemptions they cited in that disclosure will almost certainly result in embarrassment to at least some individuals, and could affect their future financial dealings with other parties. They felt that public knowledge of amounts received by individual claimants would severely prejudice future business relationships with builders and repair contractors. Further, they felt that such financial information, when circulated in the community, would unleash a flood of solicitations from every quarter. It would perhaps also subject claimants to harass-

ment from other claimants, and expose some to public ridicule. Bureau officials felt that the general effect on the impacted communities would be severely adverse, that the community in general and the claimants themselves were unwilling that the information be divulged. . . ."

At the Pocatello hearing evidence was presented which supported the Bureau's finding.

Expert testimony by a counselor and educational psychologist, who was assigned to the Disaster Planning Committee in conjunction with the State Department of Health and Welfare and a member of the Interphase Planning Committee, was directed toward psychological effect, if any, that disclosure of all four categories would have upon claimants.

Pertinent parts revealed:

" . . . I feel it will have great harm in that it will raise the anxiety and the stress level among people and probably among people who are functioning well as well as those who are not functioning well, but especially among those who are sort of marginal. Maybe I can just say that one of the things about this disaster is that it has gone on so long it has built up. People can handle immediate stress and they have done remarkably well. We have been in contact and consulting groups of national disaster planning agencies who tell us that the greatest stress is ahead. There always is the initial phase where people react well and, then, after the initial work gets accomplished, then things drag out and we anticipate that we are in that phase now and there will be additional stress. . .

" . . . I have worked with a number of people who have, and I give this just as a preliminary example, even if rumors get out or a statement gets out as to the dollar figure, that seems to be upsetting. I am thinking of one or two people in particular. That seems to cause them a lot of distress and they are also concerned about what would happen if theirs is dis-

closed. Their reaction is, 'Oh, no, they are not going to open up the whole thing again,' and the disaster—experts refer to it as a 'burned out syndrome' where their level of tolerance is just about being reached."

On cross-examination by the Government, the expert stated:

" . . . there is always one statement that can be the straw that breaks the camel's back and they said, 'Oh, my goodness. Are we going through this again?' Even people who are rebuilding their homes and have gotten their claims and they say, 'Oh, my, they are bringing this up again.'

"Now, there is great fear of that. For an example, there was a holding pond at the dam and it was broken and one man became extremely terrified that there was another flood and there was widespread fear. There was no way it could have done much damage, but it was the same kind of thing. When you have been through it once and you have about had it, that's the way it affects a lot of people."

While the people have done very well, past experience indicates they have now reached a time when the greatest difficulty often occurs. After the initial shock has worn off the stark realization of the struggle to rehabilitate themselves, having lost so many personal items, puts the victims under an additional stress. This is particularly true of many of the older victims who are in a retired position in this area and have to determine whether or not to rebuild their homes, reinvest their money, and what the tax consequences are if they reinvest.

Disclosure of all requested categories is a great potential for misunderstanding, false charges, and recrimination which makes adjustment of a severely victimized group much more difficult. Publication would cause a great deal of divisiveness. This type of disclosure is tantamount to publishing a directory of names and amounts for every fast-buck artist that wanted to operate in the vicinity.

After reviewing the legislative history of Exemptions 4 and 6, it is apparent that there must be a balance protecting an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to Government information. Success lies in providing a balance which encompasses and protects all interests yet provides for fullest responsible disclosure.

In striking a balance whether to allow disclosure of all or part of the claimants' files, this Court has weighed the interests of the public and the claimants. The Court finds that claimant's name and amount claimed are protected by Exemption 4 and Exemption 6 of the Freedom of Information Act and cannot be disclosed.

■■■ The Court concludes that to disclose (1) claimant's name; (2) amount of claim; (3) amount paid; and (4) category of payment, would be a clearly unwarranted invasion of privacy which should not be condoned. Access to categories of amount paid and category of payment merit public interest in disclosure where guarantees sufficient to safeguard privacy exist. The Court holds, therefore, the amount paid and category of payment may be disclosed with personal references or other identifying information deleted.

This matter has been brought as a class action, and until further determination by the Court as to whether this certifies as a class action, there shall be no disclosure of claimant's name or amount claimed.

Accordingly, a temporary injunction shall issue in accordance with this memorandum decision.

[See following illustration]