FLORIDA MEDICAL ASSOCIATION, INC., a Florida Corporation, on behalf of its members, Louis C. Murray, M.D., Jack McCris, M.D., Jere Annis, M.D., O. William Davenport, M.D., Robert E. Windom, M.D., and Charles H. Berchert, M.D., on behalf of themselves and all others similarly situated, Plaintiffs,

and

American Medical Association, on behalf of its members, and Robert B. Hunter, M.D., Frank J. Jirka, Jr., M.D., Lowell H. Steen, M.D., Harold Gurgone, Walter E. Schrange, Plaintiffs (Intervenors),

and

Broward County Medical Society, Amicus Curiae,

v.

DEPARTMENT OF HEALTH, EDUCATION & WELFARE, Patricia R. Harris, Secretary of Health, Education & Welfare, Blue Shield of Florida, Inc., a Florida Corporation, and Group Health, Inc., a Florida Corporation, Defendants.

No. 78–178–Civ–J–S.

United States District Court, M. D. Florida, Jacksonville Division.

Oct. 22, 1979.

William H. Adams, III, Peter L. Dearing, Stephen D. Lobrano, Jacksonville, Fla., for Florida Medical Assoc.

Newton N. Minow, Jack R. Bierig, Bernard D. Hirsh, B. J. Anderson, Chicago, Ill., for American Medical Assoc.

William DeF. Thompson, Fort Lauderdale, Fla., for amicus curiae.

John Power, Sr., Vice President Group Health, Inc., Coral Gables, Fla., for Group Health, Inc.

John Slye, Jacksonville, Fla., for Blue Shield of Florida.

Steve J. Cohen, Miami, Fla., for Broward County Medical Society.

Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for HEW.

Barbara Allen Babcock, Leonard Schaitman, Linda Cole, Terrence Jackson, Dept. of Justice, Washington, D. C., Henry R. Goldberg, Vicki Schulkin, Dept. of Health, Ed. & Welfare, Washington, D. C., for defendants.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

This case presents the question whether the Secretary ('the Secretary') of the United States Department of Health, Education & Welfare ('HEW') may disclose information concerning the annual amounts of reimbursements paid to Medicare providers in a way that would individually identify at least some of those providers. This ques-

tion carries with it a clash of two basic rights: (1) the right of citizens to have free access to knowledge about the operations of their government, and (2) their right to be free from unwarranted intrusions by the government into their personal lives and private affairs.

### Parties and Status of the Case

Plaintiff, Florida Medical Association ('FMA') is a voluntary, nonprofit professional association incorporated in the State of Florida. FMA's members are physicians licensed to practice medicine in Florida. FMA has more than 14,000 members who represent approximately 97% of practicing, licensed physicians in the State of Florida. The individual plaintiffs, Louis C. Murray, M.D., Jack McCris, M. D., Jere Annis, M. D., O. William Davenport, M. D., Robert E. Windom, M. D., and Charles E. Berchert, M. D., are physicians residing in the State of Florida and licensed to practice medicine in Florida. Defendant HEW, is an agency of the Executive Branch of the United States government. Defendant, Patricia R. Harris, is the current Secretary of HEW, and was automatically substituted pursuant to Fed.R.Civ.P. 25(d)(1) for Joseph A. Califano, Jr., the former Secretary of HEW. Defendants, Blue Shield of Florida, Inc., ('Blue Shield') and Group Health, Inc., ('Group Health') are Florida corporations licensed to do business in Florida as health insurers. Blue Shield has its principal place of business in Jacksonville, Florida. Broward County Medical Society ('BCMS') is a professional association of physicians practicing in Broward County, Florida, and has been permitted to appear as Amicus Curiae on behalf of plaintiffs in this case.

On April 28, 1978, a temporary restraining order was issued, which was extended on May 8, 1978. By agreement of the parties, the temporary restraining order remained in effect until the Court's ruling in this case or June 6, 1978, whichever occurred first. Plaintiffs' preliminary injunction motion was referred to, and heard by, the Magistrate who issued findings and recommendation on May 8, 1978. The parties filed written objections to those findings and recommendation, and the Court heard arguments concerning those objections on May 16, 1978. Additionally, the defendants and plaintiffs have filed cross-motions for summary judgment which are before the Court. Finally, the parties stipulated that the Court should consolidate its ruling on the merits in this case with its consideration of plaintiffs' preliminary injunction motion, pursuant to Fed.R.Civ.P. 65(a)(2). That stipulation provided that the Court, in ruling on the merits in this case, may consider all the evidence admitted at the hearing on plaintiffs' preliminary injunction motion before the Magistrate, as well as all of the pleadings and other documents in the record in this case.

Meanwhile, on June 12, 1978, the American Medical Association ('AMA'), on behalf of its members, and three individual physicians, as well as two individual patients, were all allowed to intervene as plaintiffs in this case against HEW and the Secretary. The AMA and the individual plaintiffs had ten days earlier commenced an action virtually identical to this one in the United States District Court for the Northern District of Illinois. A temporary restraining order against the Secretary had been issued on June 5, 1978, by the Northern District of Illinois, and extended on June 12, on the condition that the AMA and the individual plaintiffs "explore appearing in this case." The AMA is a national, voluntary professional association whose membership exceeds 200,000 licensed physicians in all 50 states, four territories, and the District of Columbia.

After the intervention of the AMA and the individual plaintiffs, the Court recertified this case as a class action, redefining the class in view of the additional plaintiffs who had been permitted to intervene. The recertified class is all physicians licensed to practice in Florida (including those who are members of the FMA and those who are not, and including those who are members of the AMA and those who are not) and all other members of the AMA who are not Florida physicians, if (1) they are providers of Medicare services within the meaning of

the Medicare Act, and (2) they would be individually identified by the Secretary in a disclosure of annual Medicare reimbursement amounts. *Florida Med. Ass'n v. HEW*, 454 F.Supp. 326, 329 n. 4 (M.D.Fla. 1978), *vac'd on other grounds* 601 F.2d 199 (5th Cir. 1979).

Although by consent of the original parties, the temporary restraining order in this case had been extended through June 19, 1978, once the AMA and the new individual plaintiffs had intervened in this case, the Court issued a temporary restraining order on their behalf, which was extended for an additional ten days. In the interim, the Secretary had obtained extensions of time in which to file an additional memorandum of law. Faced with the likelihood that its limited subject matter jurisdiction might vanish by the Secretary's unrestrained disclosure of the information that he proposed to release, the Court, while waiting for the Secretary's memorandum of law, issued what it termed 'an Ancillary Writ of Injunction' which the Court believed was derived from its ancillary jurisdiction attendant to the Court's original subject matter jurisdiction over this case, and from the Court's all writs jurisdiction under 28 U.S.C. § 1651(a). Since that time, however, the Fifth Circuit Court of Appeals has determined that the ancillary and all writs jurisdiction of the Court to fashion equitable, injunctive relief, is curtailed by the provisions and requirements for issuing temporary restraining orders and preliminary injunctions under Fed.R.Civ.P. 65. *Florida Med. Ass'n v. HEW*, 601 F.2d 199, 203 (5th Cir. 1979), *vac'g* 454 F.Supp. 326 (M.D.Fla.1978).

### Facts

The federal program of health insurance for eligible aged and disabled persons is known as 'Medicare'. 42 U.S.C. § 1395 *et seq.* The HEW Secretary is responsible for administering the Medicare program. Part A of the program[1] provides hospital and medical care insurance for eligible beneficiaries.[2] Part B[3] furnishes voluntary supplemental medical insurance by reimbursing from federal funds up to 80% of the reasonable costs (reduced by an annual $60.00 deductible amount) of "providers of services"[4] and other individuals supplying medical and health care services. The reimbursements are channeled from HEW through contracts with health insurance carriers (including the physical intermediaries under Part A of the program),[5] such as defendants Blue Shield and Group Health.

Enrolled beneficiaries can submit two kinds of claims for reimbursement of reasonable health care costs: assigned and unassigned. Assigned claims are transferred to the provider or other individual (such as a physician) who renders health services. The provider or physician submits the claim for reimbursement of reasonable costs to a carrier; and, in accordance with the contract between the carrier and HEW, 80% of the reasonable costs are paid directly to the provider or physician. Unassigned claims are submitted by the patient to the carrier for reimbursement of 80% of the reasonable costs; but the patient must pay the physician or provider directly for the entire amount charged. The effect of the distinction between assigned and unassigned claims is that while a physician or provider is guaranteed payment for services under assigned claims, remuneration is limited to 80% of the reasonable costs; but, without the security of remuneration from federal funds, a physician or provider can require the full amount of charges under unassigned claims, although the patient is limited to reimbursement from the government of reasonable costs[6] only.

1. 42 U.S.C. § 1395c et seq. (1976).

2. 42 U.S.C. § 1395i–2 establishes the eligibility criteria for individuals to receive benefits.

3. 42 U.S.C. § 1395j et seq. (1976).

4. 42 U.S.C. § 1395x(u) defines 'provider of services'.

5. 42 U.S.C. § 1395u(a)–(f) (Supp.1978).

6. 42 U.S.C. § 1395x(v)(1)(A), together with the Secretary's regulations, 42 C.F.R. §§ 405.460 and 405.461, establish the criteria for determining reimbursable "reasonable costs."

All claims submitted, whether assigned or unassigned, include the names of the physicians providing health services. Those names are stored by the carriers in computerized information retrieval systems. As a result, it is possible for each carrier to supply lists of individually named physicians, together with the correlated gross amounts of reimbursements for Medicare claims (assigned and unassigned), for each physician's services. In 1977, 68% of the Medicare payments handled through Blue Shield were unassigned claims, while 32% were assigned. The total Medicare reimbursements paid through Blue Shield were $5,748,753.00. Forty percent of the 1977 Medicare reimbursements channeled through Group Health were unassigned, while 60% were assigned; and the total amount of Medicare reimbursements paid through Group Health was $2,061,189.00.

In March, 1977, the Hew Secretary publicized a list containing the names of physicians or groups of physicians whose services rendered during 1975 totaled $100,000.00. With each name on the list was correlated the gross amount of 1977 reimbursements for Medicare claims, both assigned and unassigned. That information was widely publicized in the news media. Although it was later determined that the information published was inaccurate in many ways, plaintiffs do not challenge the accuracy of the Secretary's disclosure of such information. Also in March, 1977, the Secretary published in the Federal Register (42 Fed. Reg. 14703) an interim amendment to the rules for disclosure of Social Security records, contained in 20 C.F.R. § 401.1 *et seq.*, in order to conform the current regulations to the most recent requirements of the Freedom of Information Act. The effect of the amendment to 20 C.F.R. § 401.1 *et seq.* was to adopt the principles of the Freedom of Information Act as guiding rules for the disclosure of information by HEW. 42 Fed. Reg. at 14704. *See* 20 C.F.R. § 401.3(a). In November, 1977, the Secretary directed the various carriers with whom HEW had contracted to prepare and publish by April 30, 1978, a list of all physicians and providers for whose services Medicare reimbursements had been paid in 1977. The list was to include full names of the physicians and providers, their addresses, the net total amount of Medicare reimbursement paid for assigned claims to each physician or provider, and the net total amount of Medicare reimbursements paid to beneficiaries for unassigned claims for services furnished by each physician or provider. The Secretary took steps to ensure the accuracy of the information, by requiring each carrier to notify the affected physicians and providers of the information intended to be disclosed. The carriers received complaints, with changes and corrections, concerning the information intended to be disclosed about each physician and provider. Plaintiffs and plaintiffs-intervenors have brought this action on behalf of themselves and the class represented, seeking the Court to enjoin the Secretary's disclosure of this information, and to declare that the proposed disclosure is unlawful.

*Jurisdiction*

Although the Court has not otherwise previously reached the merits of this case, in order to justify the purported exercise of its ancillary jurisdiction when fashioning the equitable, injunctive relief that was labeled 'Ancillary Writ of Injunction', which the Fifth Circuit vacated, *Florida Med. Ass'n v. HEW*, 601 F.2d 199 (5th Cir. 1979), the Court found it necessary to determine at the outset whether its limited subject matter jurisdiction had been genuinely invoked. The Court concluded that it had. *Florida Med. Ass'n v. HEW*, 454 F.Supp. at 332 and n. 6.

■ First, the Court found that its federal question subject matter jurisdiction, under 28 U.S.C. § 1331, was properly and genuinely invoked over the issues in this case. The Court noted that a recent *en banc* court of appeal's decision, *Dr. John T. MacDonald Foundation, Inc. v. Califano*, 571 F.2d 328 (5th Cir. 1978) (*en banc*), cert. denied 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d

238 (1978), had ruled that there is no federal question jurisdiction under 28 U.S.C. § 1331 to review decisions by the HEW Secretary concerning claims arising under the Medicare Act. The reason for that decision was that the Medicare Act incorporated 42 U.S.C. § 405(h) of the Social Security Act (which forbids review of the Secretary's findings and decisions); but the Medicare Act did not incorporate 42 U.S.C. § 405(g) of the Social Security Act (which provides judicial review of the Secretary's findings and decisions). In passing, however, the Fifth Circuit noted that there was no absolute denial of jurisdictional review concerning federal constitutional issues, since there was jurisdiction in the Court of Claims for monetary relief, in accordance with that court's decision of *Whitecliff, Inc. v. United States*, 536 F.2d 347, 210 Ct.Cl. 53 (1976), *cert. denied* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

Then the Fifth Circuit followed its *en banc* decision with *American Ass'n of Councils of Med. Staffs of Private Hosps., Inc. v. Califano*, 575 F.2d 1367 (5th Cir. 1978). Once again the Court of Appeals held that there was no federal question jurisdiction to challenge HEW regulations issued under the Medicare Act affecting the eligibility of smaller institutions (hospitals, skilled nursing facilities, and home health agencies) under the Medicare Act, unless they used extra-institution utilization review committees. *Id.* at 1369. The Fifth Circuit held that it did not have subject matter jurisdiction to review the statutory and constitutional issues raised. *Id.* at 1372.

Still later, in *Moody Nursing Home, Inc. v. Califano*, 578 F.2d 1158 (5th Cir. 1978), the Fifth Circuit, following its *en banc* decision in *Dr. John T. MacDonald Foundation, Inc. v. Califano, supra*, held that there is no federal question jurisdiction for the district court to review a decision by the HEW Secretary, concerning the scope and amounts of Medicare reimbursements allowable to the plaintiff-nursing home. *Id.* at 1159.

And most recently, the Court of Appeals once again adhered to its decision in *Dr.*

*John T. MacDonald Foundation, Inc. v. Califano, supra. Alabama Hosp. Ass'n v. Califano*, 587 F.2d 762 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 48, 62 L.Ed.2d 32 (1979), was a case where the plaintiff-hospital association sued the HEW Secretary and Alabama Blue Cross and Blue Shield. HEW had decided that amounts of reimbursements paid to the provider-hospitals (who were members of the association) under the Medicare Act "were unnecessary" and therefore those amounts should be recouped. *Id.* at 763. Plaintiff-association contended that such a unilateral, administrative decision amounted to a taking of property without due process, in violation of the Fifth Amendment. *Id.* The Fifth Circuit, however, consistently ruled that the Medicare Act did not allow federal question jurisdiction "to review the validity of HEW's reimbursement procedures." *Id.*

Nevertheless, the Court continues to adhere to its decision that the present case is not controlled by those decisions. None of the statutorily-grounded or constitutionally-based claims in the present case challenge any decision made by the HEW Secretary pursuant to the Medicare Act.

The Secretary's decision, and the proposed conduct which plaintiffs contest, is founded squarely upon the Freedom of Information Act ('FOIA') and the Secretary's own regulations issued to implement that act. 5 U.S.C. § 552; 20 C.F.R. § 401.1 *et seq.* By challenging the lawfulness of the Secretary's decision and proposed conduct, under the FOIA and HEW's own FOIA-implementing regulations, plaintiffs raise a federal question about the conduct of an agency and officer of the United States. . . . [additionally] plaintiffs contest the Secretary's decision and proposed conduct on grounds stemming from independent federal statutes (such as the Privacy Act, the FOIA, the Trade Secrets Act, and the Social Security Act), as well as from provisions of the Constitution. *Hence, for controversies (1) premised upon statutory and constitutional provisions other than the*

*Medicare Act, and (2) concerning agency and officer conduct based upon statutes other than the Medicare Act, the Court has original subject matter jurisdiction under 28 U.S.C. § 1331(a).* (emphasis added).

*Florida Med. Ass'n v. HEW,* 454 F.Supp. at 333 n. 6. The Court continues to so hold.[7]

■ Furthermore, 28 U.S.C. § 1331(a) also supplies federal question subject matter jurisdiction for review of plaintiffs' claim that the Secretary's decision, and proposed conduct, do not measure up to the appropriate standard for agency action under the review provided by the Administrative Procedure Act. 5 U.S.C. § 706. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 315 and n. 47, 99 S.Ct. 1705, 1724 and n. 47, 60 L.Ed.2d 208, 234 and n. 47 (1979); *Califano v. Sanders,* 430 U.S. 99, 106–07, 97 S.Ct. 980, 984–985, 51 L.Ed.2d 192, 200 (1977).

Finally, by asserting that the Secretary's decision and proposed conduct violate the conditions for disclosure provided by the Privacy Act, plaintiffs invoke the Court's jurisdiction conferred under 5 U.S.C. § 552a(g)(1)(D) of the Privacy Act to consider alleged violations of it. [*Zeller v. United States,* 467 F.Supp. 487, 495 (E.D.N.Y.1979)]; *Harper v. United States,* 423 F.Supp. 192, 195 (D.S.C.1976).[8]

In short, the Court holds that it has subject matter jurisdiction over the issues in this case.

*Florida Med. Ass'n v. HEW,* 454 F.Supp. at 334 n. 6. *Cf. Chrysler Corp. v. Brown,* 441 U.S. at 287, 99 S.Ct. at 1710, 60 L.Ed.2d at 216. The Court's conclusion that it has subject matter jurisdiction over the claims and issues raised in this case remains firm.

### Merits

A. *The Trade Secrets Act;* 18 U.S.C. *§ 1905*

■ Plaintiffs argue that the Secretary's proposed disclosure would violate the Trade

---

7. While plaintiffs' claims in this case involve Medicare reimbursement information, plaintiffs have no unique interest in that information in itself. Plaintiffs' interest, which they assert as arising under several federal statutory and constitutional provisions, is in the preservation of their right of privacy. Any other body of information which the government proposed to disclose in an individually-identifying way, without the affected individuals' prior consent, would precipitate the same privacy interest that plaintiffs assert.

The substantive claims and issues which plaintiffs raise, to protect and enforce their privacy interest, stem from federal statutes and constitutional provisions, and are therefore independent of the Medicare Act. It is over those claims and issues that 28 U.S.C. § 1331(a) supplies federal question subject matter jurisdiction.

8. 5 U.S.C. § 552a(g)(1)(D) of the Privacy Act is a general grant of a right of action to individuals covered by the Act. Jurisdiction is expressly conferred upon the district courts for civil actions against federal agencies that fail "to comply with any other provision" or "any other rule promulgated" under the Privacy Act, when such failure adversely affects the individual.

In contrast, 5 U.S.C. § 552a(g)(4)(A) is an express waiver of sovereign immunity by Congress, creating a right to obtain a damage remedy from the United States when one of its agencies intentionally or wilfully acts in violation of the Privacy Act and its applicable implementing regulations.

The general grant of a right of action, and of corresponding jurisdiction in the district courts, under § 552a(g)(1)(D) confers the subject matter jurisdiction upon the Court to issue injunctive and declaratory relief. The specific creation of a right to obtain damages against the United States, under § 552a(g)(4)(A), is a special waiver of sovereign immunity for the recovery of damages from the government, under egregious circumstances where a federal agency has acted with an intentional or wilful disregard for, and violation of, the provisions of the Privacy Act.

The two provisions are not inevitably conflicting. Courts have a duty to interpret statutes so that all of the provisions can be reconciled into a harmonious whole, without internal conflict or repugnancy, if possible. *Citizens to Save Spencer County v. EPA,* 195 U.S.App.D.C. 30, 56–57, 600 F.2d 844, 870–71 (D.C.Cir.1979); *National Bank & Trust Co. v. United States,* 589 F.2d 1298, 1302 (7th Cir. 1978); *SCM Corp. v. Langis Foods, Ltd.,* 176 U.S.App.D.C. 194, 200, 539 F.2d 196, 202 (D.C.Cir.1976); *Bailey v. United States,* 511 F.2d 540, 545–46, 206 Ct.Cl. 169, 112 U.S.App.D.C. 295, 301, (1975); *Montgomery Charter Service, Inc. v. Washington Metropol. Area Transit Comm'n,* 117 U.S.App.D.C. 34, 38, 325 F.2d 230, 234 (D.C.Cir.1963); *Maiatico v. United States,* 112 U.S.App.D.C. 295, 301, 302 F.2d 880, 886 (D.C.Cir.1962); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Sheppard,* 123 F.2d 773, 775 (5th Cir. 1942), *cert. denied* 316 U.S. 704, 62 S.Ct. 1309, 86 L.Ed. 1772 (1942).

Secrets Act, 18 U.S.C. § 1905.[9] The statute is a criminal, minor offense statute, *see* 18 U.S.C. § 3401(f), authorizing a fine of $1,000.00 or imprisonment up to one year, or both, as well as automatic removal from office or employment. The statute prohibits federal officers or employees from disclosing, "to any extent not authorized by law," trade secrets and other confidential business or financial information. However, the statute does not afford an implied, private civil right of action to enjoin disclosures that might violate the statute. *Chrysler Corp. v. Brown*, 441 U.S. at 316, 99 S.Ct. at 1725, 60 L.Ed.2d at 234; *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. 236, 241–42 (M.D.Fla.1979). Nothing in the legislative history or facial language of the statute suggests any congressional intent that would allow the inference of a private right of action derivable from the statute. *Chrysler Corp. v. Brown*, 441 U.S. at 317, 99 S.Ct. at 1725, 60 L.Ed.2d at 234; *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. at 244. Furthermore, the proscription of the statute, and the penalties that it imposes, are sufficiently effective to carry out the congressional purpose, without inferring the right of civil actions for injunctive relief. *Chrysler Corp. v. Brown*, 441 U.S. at 317, 99 S.Ct. at 1725, 60 L.Ed.2d at 234; *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. at 244.

### B. *The Social Security Act; 42 U.S.C. § 1306*

Plaintiffs also argue that the ban on disclosure of information obtained by the Secretary, under the Social Security Act, forbids his proposed disclosure of the information in this case. 42 U.S.C. § 1306 provides in pertinent part:

No disclosure of . . . any file, record, report or other paper, or any information, obtained at any time by the Secretary of Health, Education, and Welfare, . . . or by any officer or employee of [HEW] in the course of discharging their respective duties under this chapter, and no disclosure of any such file, record, report, or other paper, or information, obtained at any time by any person from the [HEW Secretary] . . . or from any officer or employee of [HEW] . . shall be made except as the [HEW Secretary] . . . may by regulations prescribe . . .

The statute prohibits disclosure of information unless it is authorized under regulations issued by the Secretary. *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. at 254; *Parkridge Hosp., Inc. v. Blue Cross & Blue Shield of Tenn.*, 430 F.Supp. 1093, 1097 (E.D.Tenn.1977). Consistently throughout the statute's legislative history, both its prohibition and its exception have applied to a broad range of information "formerly or presently possessed by the HEW Secretary (or his predecessors in interest) and his agents." *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. at 254 n. 7. Furthermore, "judicial interpretation of the statute has uniformly ascribed to it a broad coverage of information possessed by the HEW Secretary and his agents." *Id.* and n. 8.

■ Hence, in accordance with the authority of the statute, the Secretary expressly issued regulations, 20 C.F.R. § 401.1 *et seq.*, to implement the statute, "while accommodating the requirements of the FOIA as it applies to information covered

---

**9.** The Trade Secrets Act, 18 U.S.C. § 1905, provides:

Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

by [42 U.S.C. § 1306]." 42 Fed.Reg. 14703 (Mar. 16, 1977). Those regulations, although originally antedating the statute by two years, have since 1939 shown a consistent administrative interpretation of the statute in an increasingly expansive scope. *Id.* at 254–55 and n. 9. The regulations provide for the release, under the requirements of the FOIA, of information otherwise prohibited from disclosure by the general ban of 42 U.S.C. § 1306. *See* 20 C.F.R. § 401.1(a). They are discretionary regulations authorizing disclosure of information covered by the statute, 42 U.S.C. § 1306, and hence come within its exception for disclosures authorized by regulations prescribed by the HEW Secretary. At the same time, the regulations parallel the provisions of the FOIA, both mandatory and exemptive. 20 C.F.R. § 401.2. Information subject to mandatory disclosure by the FOIA is required to be released under the regulations as well. 20 C.F.R. § 401.-3(b)(1)(ii). Information exempted from the FOIA's obligatory disclosure requirements may "nevertheless . . . be made available" in accordance with HEW's procedural, public information regulations "for disclosures which are in the public interest and consistent with obligations of confidentiality and administrative necessity." 20 C.F.R. § 401.3(b)(2). Such a long-standing administrative interpretation of the statute, having survived successive congressional re-enactments of the statute, and especially when harmoniously coupled with the FOIA's mandatory and exempting provisions, is entitled to great weight and deference by the courts, unless clearly erroneous. *See Westchester Gen. Hosp., Inc. v. HEW,* 464 F.Supp. at 255, and cases cited thereat.

Consequently, to the extent that the Secretary bases the authority for her proposed disclosure upon the regulations, 20 C.F.R. § 401.1 *et seq.,* implementing the Social Security Act, 42 U.S.C. § 1306, that statute would not prohibit, but would permit, such disclosure.

### C. *FOIA & Mandatory Disclosure*

■ That the FOIA is exclusively a statute of sweeping, mandatory disclosure is by now beyond question. *Chrysler Corp. v. Brown,* 441 U.S. at 290, 99 S.Ct. at 1712, 60 L.Ed.2d at 219; *Westchester Gen. Hosp., Inc. v. HEW,* 464 F.Supp. at 238–39. Therefore, despite the absence of a particular requester under the FOIA for the information at issue in the present case, unless the disclosure of that information falls within the scope of one of the FOIA's exemptions, it may not be prohibited. In addition, even if the information which the Secretary proposes to disclose should fall within one of the exemptions to the FOIA's obligatory disclosure provisions, those exemptions do not provide a legal basis for enjoining disclosure. In other words, the disclosure provisions of the FOIA are mandatory; but the exemptions from mandatory disclosure, in themselves, are discretionary. In short, the FOIA exemptions do not forbid the disclosure of information, and therefore do not authorize an inverse-FOIA action for injunctive relief. *Chrysler Corp. v. Brown,* 441 U.S. at 285, 290–294, 99 S.Ct. at 1709, 1712–1714, 60 L.Ed.2d at 215, 219–20; *Westchester Gen. Hosp., Inc. v. HEW,* 464 F.Supp. at 238–39.

### D. *FOIA & Exemption 3*

■ Although Exemption 3 of the FOIA allows certain qualifying nondisclosure statutes to override the obligatory disclosure provisions of the FOIA, none of the other statutes that plaintiffs rely on qualifies as the kind of statute to which Exemption 3 applies. 5 U.S.C. § 552(b)(3) provides:

This section does not apply to matters that are—specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld; . . .

The latter two qualifying conditions were added by Congress in a 1976 amendment to the statute. Act of Sept. 13, 1976 Pub.L. No. 94–409, 90 Stat. 1241. In order for a

nondisclosure statute to override the compulsory disclosure requirements of the FOIA, by means of its third exemption, the particular statute must (1) absolutely forbid disclosure or (2) set forth specific standards and criteria for withholding information or refer with sufficient particularity to the kinds of information to be withheld so as to remove any unlimited discretion about withholding or disclosing the information in question. *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. at 240 and n. 2.

■ The Trade Secrets Act, 18 U.S.C. § 1905, does not qualify under Exemption 3 to override the FOIA's obligatory disclosure provisions. It is a general, unlimited delegation of discretionary authority, to withhold disclosure of information "to any extent not authorized by law." Consequently, when Congress amended Exemption 3 of the FOIA in 1976, it expressly declared that the Trade Secrets Act did not qualify under the amended Exemption 3. *See* H.Rep. No. 880, 94th Cong. 1st Sess. at 23, U.S.Code Cong. & Admin.News, pp. 2183, 2205 (1976). The Trade Secrets Act, therefore, is subject to the overriding mandatory disclosure provisions of the FOIA. *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. at 242–43.

■ Neither is the Social Security Act, 42 U.S.C. § 1306, a statute which overrides the obligatory disclosure provisions of the FOIA, by means of Exemption 3. That statute is a broad, general nondisclosure statute, prohibiting the release of information unless such disclosure is authorized by regulations issued by the HEW Secretary. When it amended Exemption 3 of the FOIA in 1976, Congress expressly declared that "Another example of a statute whose terms do not bring it within this exemption [Exemption 3] is section 1106 of the Social Security Act (42 U.S.C. § 1306)." H.Conf. Rep. No. 1441, 94th Cong. 1st Sess. 14, 25, U.S.Code Cong. & Admin.News at 2244, 2261. As a direct result of the 1976 amendment to Exemption 3 of the FOIA, therefore, a general, discretionary nondisclosure statute like 42 U.S.C. § 1306 no longer qualifies as the kind of authority to withhold information by virtue of Exemption 3,

in the face of the FOIA's liberal disclosure requirements.

Neither the Trade Secrets Act nor the Social Security Act operates through Exemption 3 to forbid disclosures required under the FOIA. Hence, to the extent that the Secretary has based her decision to disclose the information at issue in this case upon the conclusion that the FOIA requires such disclosure, the Trade Secrets Act and the Social Security Act are not available to override that conclusion by means of Exemption 3.

### E. *FOIA & Exemption 4*

■ Exemption 4 of the FOIA permits "trade secrets and commercial or financial information obtained from a person and privileged or confidential" to be withheld from disclosure if warranted. Although Exemption 4 primarily applies to trade secrets, it also protects individuals from disclosure of commercial or financial information that is privileged or confidential. For information other than trade secrets to qualify for Exemption 4 of the FOIA, three essential criteria must be met: (1) the information must be commercial or financial, (2) obtained from a person, and (3) privileged or confidential. *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. at 245. In the absence of a statutory definition of the term "confidential" for commercial or financial information, the courts have universally accepted the twofold, objective test set forth in *National Parks & Conservation Ass'n v. Morton*, 162 U.S.App.D.C. 223, 228, 498 F.2d 765, 770 (D.C.Cir.1974):

> . . . commercial or financial matter is "confidential" for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.

*See Westinghouse Elec. Corp. v. Schlesinger*, 542 F.2d 1190, 1207 n. 55 (4th Cir. 1976); *Charles River Park "A", Inc. v.*

*HUD*, 171 U.S.App.D.C. 286, 291, 519 F.2d 935, 940 (D.C.Cir.1975); *Continental Oil Co. v. FPC*, 519 F.2d 31, 35 (5th Cir. 1975), *cert. denied sub nom. Superior Oil Co. v. FPC*, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 794 (1976); *Rural Housing Alliance v. United States Dep't of Agric.*, 162 U.S.App.D.C. 122, 127–128, 498 F.2d 73, 78–79 (D.C.Cir. 1974); *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. at 245, and 434 F.Supp. 435, 438 (M.D.Fla.1977); *Parkridge Hosp., Inc. v. Blue Cross & Blue Shield of Tenn.*, 430 F.Supp. at 1096; *Sonderegger v. United States Dep't of Interior*, 424 F.Supp. 847, 852 (D.Idaho 1976). Only commercial or financial information that satisfies either of the twofold, definitional tests of "confidential" is exempt under Exemption 4 from mandatory disclosure. *Continental Oil Co. v. FPC*, 519 F.2d at 36; *Charles River Park "A", Inc. v. HUD*, 171 U.S.App.D.C. at 291, 519 F.2d at 940; *Westchester Gen. Hosp., Inc. v. HEW*, 464 F.Supp. at 245.

■ It is clear that the information at stake in the present case does not qualify as confidential commercial or financial information, under the universally accepted, twofold test. It simply cannot reasonably be concluded that the Secretary's proposed disclosure would result in an impairment to the government's ability to obtain similar, necessary information in the future. The reason is that such information is compiled by the government as it reimburses Medicare providers under the act. Neither can it reasonably be concluded that the Secretary's proposed disclosure would cause plaintiffs-providers substantial harm to their competitive positions.

F. *FOIA & Exemption 6*

■ Exemption 6 relieves from the mandatory disclosure provisions of the FOIA "personnel and medical files and similar files" when such disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). To determine whether the exemption applies, a two-step analysis is used by the courts; and that determination is made *de novo*, not bound in any way by prior, administrative

views. *Department of Air Force v. Rose*, 425 U.S. 352, 379, 96 S.Ct. 1592, 1607, 48 L.Ed.2d 11, 31–32 (1976).

First, the courts must determine whether the particular information in question qualifies *prima facie* as "personnel and medical files and similar files" which Exemption 6 covers. For information that is purely and patently contained in personnel files and medical records, there is no question about the presumptive applicability of Exemption 6. Most of the cases in which the question of the applicability of Exemption 6 has arisen, however, have involved a determination about whether the information at issue was included within the term "similar files" of the exemption.

■ The legislative history indicates that the exemption was intended by Congress to apply to information within the Veterans Administration, the HEW Department, the Selective Service Administrative, and the United States Bureau of Prisons. S.Rep. No. 813, 9; H.Rep. No. 1497, 89th Cong. 2d Sess., 11, U.S.Code Cong. & Admin.News, pp. 2418, 2428 (1966); *Department of Air Force v. Rose*, 425 U.S. at 375 n. 14, 96 S.Ct. at 1606 n. 14, 48 L.Ed.2d at 29 n. 14; *Pacific Molasses Co. v. NLRB*, 577 F.2d 1172, 1178–79 and nn. 3 and 4 (5th Cir. 1978). In addition, the term "similar files" should be given a broad interpretative scope in order to protect the persons for whom it was designed, and to trigger the second, more crucial step in the Court's analysis: whether the disclosure of the information would amount to "a clearly unwarranted invasion of personal privacy." *Pacific Molasses Co. v. NLRB*, 577 F.2d at 1179–81; *Committee on Masonic Homes v. NLRB*, 556 F.2d 214, 219–20 (3d Cir. 1977), *vac'g & remanding* 414 F.Supp. 426 (E.D.Pa.1976); *Wine Hobby USA, Inc. v. IRS*, 502 F.2d 133, 135 (3d Cir. 1974); *Rural Housing Alliance v. United States Dep't of Agric.*, 162 U.S.App.D.C. 122, 126 and n. 13, 498 F.2d 73, 77 and n. 13 (D.C.Cir.1971).

■ Courts must look past mere appearances and beneath labels, to the actual character and nature of the information in question. *Department of Air Force v. Rose*,

425 U.S. at 374, 96 S.Ct. at 1605, 48 L.Ed.2d at 29. The common denominator and pivotal characteristic of all information to which the term "similar files" applies *prima facie* is the personal quality and nature of that information. Hence, information identifiable as applying to some particular individual, and disclosure of which would cause some special embarrassment to that individual, is presumptively included within the term "similar files" of Exemption 6. *Pacific Molasses Co. v. NLRB*, 577 F.2d at 1181 and n. 5; *Columbia Packing Co. v. United States Dep't of Agric.*, 563 F.2d 495, 500 n. 3 (1st Cir. 1977), *aff'g* 417 F.Supp. 651 (D.Mass.1976); *National Parks & Conserv. Ass'n v. Kleppe*, 178 U.S.App.D.C. 376, 388–389, 547 F.2d 673, 685–86 (D.C.Cir.1976); *Wine Hobby USA, Inc. v. IRS*, 502 F.2d at 135, 136.

> Personal or "personalized" financial information may well qualify under the "similar files" rubric of exemption six, at least insofar as it contains "embarrassing disclosures" or involves "sufficiently intimate details." . . . *National Parks & Conserv. Ass'n v. Kleppe*, 178 U.S.App. D.C. at 388, 547 F.2d at 685.

Additionally, information which would otherwise be disclosable readily after redaction, deleting any personally identifying details that could cause embarrassment, is precisely what Exemption 6 was intended, at least presumptively, to cover. *See Department of Air Force v. Rose*, 425 U.S. at 373–74, 96 S.Ct. at 1604–1605, 48 L.Ed.2d at 28–29; *Chamberlain v. Kurtz*, 589 F.2d 827, 842 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 82, 62 L.Ed.2d 54, (1979); *Committee on Masonic Homes v. NLRB*, 556 F.2d at 220; *Campbell v. United States Civ. Service Comm'n*, 539 F.2d 58, 61–62 (10th Cir. 1976). There can be no doubt that the list of annual reimbursements to Medicare providers which the HEW Secretary proposes to disclose is information included within the term "similar files" of Exemption 6 of the FOIA. Such information is obviously stored with, and compiled by the HEW Department. Furthermore, the fact that the Secretary is unwilling to disclose the same information in a way that would omit the personally identifying details which might cause embarrassment, emphasizes the presumptive inclusion of that information within the term "similar files" of Exemption 6.

■ The second step in the Court's analysis of Exemption 6 requires a balancing, in order to determine whether disclosure of the information in question would "constitute a clearly unwarranted invasion of personal privacy." In necessitating such a balancing procedure, Exemption 6 is unique among the exemptions of the FOIA. *Rural Housing Alliance v. United States Dep't of Agric.*, 162 U.S.App.D.C. at 126, 498 F.2d at 77; *Getman v. NLRB*, 146 U.S.App.D.C. 209, 213 n. 10, 450 F.2d 670, 674 n. 10 (D.C.Cir.1971). As a result, there is no blanket or *per se* applicability of the exemption. *Congressional News Syndicate v. United States Dep't of Justice*, 438 F.Supp. 538, 543 (D.D.C.1977); *Sonderegger v. United States Dep't of Interior*, 424 F.Supp. at 853.

The Court must decide whether there is an invasion of personal privacy in the proposed disclosure; and there surely is. Then, the Court must identify and balance the competing public and private interests at stake. The Secretary asserts the public's interest in knowing the amounts of public funds spent in reimbursing Medicare providers annually, especially in light of the ongoing legislative debate over national health insurance. That concern is unquestionably one of legitimate and important interest.

On the other hand, plaintiffs point out that (1) the annual amounts of Medicare reimbursements received by individuals are traditionally confidential and personal information about at least part of those individuals' gross incomes; (2) in accepting the provisions of the Medicare Act, and its implementing regulations, it was never contemplated by those individual providers that they and their annual amounts of reimbursements would be identifiably disclosed; and (3) the public interest goals which the Secretary aims to further are no less benefited and satisfied by disclosure in

a manner that avoids personally and individually identifying details. While the inclusion of the term "clearly" in the phrase "clearly unwarranted invasion of personal privacy" may well suggest that the balance should initially be tilted in favor of disclosure, *Rural Housing Alliance v. United States Dep't of Agric.,* 162 U.S.App.D.C. at 126, 498 F.2d at 77; *Getman v. NLRB,* 146 U.S.App.D.C. at 213 n. 10, 450 F.2d at 674 n. 10; *Disabled Officers Ass'n v. Rumsfeld,* 428 F.Supp. 454, 457, 459 (D.D.C.1977); *Metropolitan Life Ins. Co. v. Usery,* 426 F.Supp. 150, 169 (D.D.C.1976); *Philadelphia Newspapers, Inc. v. United States Dep't of Justice,* 405 F.Supp. 8, 10 (E.D.Pa.1975), the tilt is outweighed by disclosures that unnecessarily contain personally identifying details. Such unnecessarily identifying disclosures, despite the serious public interest which they are intended to serve, do "constitute a clearly unwarranted invasion of personal privacy," since in advancing those public interests there is no justifiable reason for exposing the personally identifying details to public view.

■ The Court finds that the national debate over putative legislative activity involving national health insurance may well be served by disclosing the annual amounts of public funds expended for reimbursement of providers of services under the Medicare Act. But that public concern is no further advanced by revealing the identity of individual providers and their annual reimbursement amounts; neither is that concern diminished by omitting such personally identifying details. The Court, therefore, holds that the Secretary's proposed disclosure, at least in the individually identifying manner that she intends, is included within Exemption 6 of the FOIA, because it amounts to "similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

### G. *Exemption 6 & the Privacy Act*

■ As one court has commented, *Sears, Roebuck & Co. v. GSA,* 180 U.S.App.D.C. 202 at 207, 553 F.2d 1378 at 1383, the Priva-

cy Act does not affect the initial, second-step balancing analysis used in determining the applicability of Exemption 6 of the FOIA to particular information in question. If the tilt in favor of disclosure is tipped contrariwise by the interests of personal privacy, the shift in the scales should occur independently of, and without any impact from, the Privacy Act. On the other hand, once the balance has been weighed and found to favor exemption from disclosures that "constitute a clearly unwarranted invasion of personal privacy," the relationship of Exemption 6 to the Privacy Act becomes significant. Information exempted under Exemption 6, from the mandatory disclosures provisions of the FOIA, becomes protected from disclosure by the Privacy Act, unless that information should be disclosable under rules implementing the Privacy Act.

■ The Privacy Act is essentially a House carcass under a Senate hide. During the Ninety-third Congress, two bills were introduced to enact privacy legislation, one in the House and one in the Senate (H.R. 16373 and S. 3418, respectively). Late into the Second Session of the Ninety-third Congress, each congressional house continued to advocate its own bill. The bills, however, were markedly different from each other in many of their provisions and aims. *Cf. Cell Assoc., Inc. v. National Institutes of Health,* 579 F.2d 1155, 1160–61 and n. 1 (9th Cir. 1978); *Local 2047, Amer. Fed. of Gov't Employees v. Defense Gen. Supply Center,* 423 F.Supp. 481, 485 and n. 9 (E.D.Va.1976), *aff'd* 573 F.2d 184 (4th Cir. 1978). *Cf. also,* H.R. 16373 and accompanying H.Rep. No. 1416 (Oct. 2, 1974), with S. 3418 and accompanying S.Rep. No. 1183 (Sept. 26, 1974), U.S.Code Cong. & Admin.News, p. 6916 *et seq.* (1974). Because of the lateness in the legislative day, and the strong bipartisan concern for legislation that would protect the personal privacy of the nation's citizens, *cf.* 120 Cong.Rec. S. 19854 (Nov. 21, 1974), the usual joint, House-Senate conference committee was not convened to resolve differences and report out a single bill. Instead, both bills shuttled back and forth,

with each house amending its own and the other house's bill. What finally emerged was the Senate bill, S. 3418, with a series of successively reciprocal amendments to it. For example, the House amended the Senate bill; the Senate then amended those amendments; and the House, in turn, amended the Senate's amendments to the House's earlier amendments. Finally, the Senate concurred in "the House amendments to the Senate amendments to the House amendments." 120 Cong.Rec. S. 21195–96 (Dec. 18, 1974). The net result of those successive reciprocal amendments was that substantial parts of the Senate bill's provisions were struck out, and amended with insertions of provisions from the House bill. Regardless of the otherwise conflicting persuasive effect of the decisions in *Cell Assoc., Inc. v. National Institutes of Health, supra,* and *Local 2047, Amer. Fed. of Gov't Employees v. Defense Gen. Supply Center, supra,* one thing they both recognize and agree on: the Senate bill, which ultimately became the Privacy Act, Pub.L. 93–579 (Dec. 31, 1974), to a large extent embodied the provisions of the original House bill, H.R. 16373. A close comparison of the original two bills, H.R. 16373 and S. 3418, with the final legislative result, Pub.L. 93–579 (Dec. 31, 1974), 88 Stat. 1896 *et seq.,* inescapably demonstrates that, under the apparent exterior of the Senate bill's number, the heart of the Privacy Act was transplanted from the House bill's substantial provisions. Consequently, while both houses' reports are valuable in discerning the legislative intent of the Privacy Act, the House Report, H.Rep.No. 1416 (Oct. 2, 1974), often becomes more important in deciphering the legislative history underlying the basic provisions and goals of the statute.

■ Language in the House report illuminates the relationship between the Privacy Act and Exemption 6 of the FOIA.

This legislation would have an effect on [Exemption 6] of the Freedom of Information Act . . . , which states that the provisions regarding disclosure of information to the public shall not apply to material "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." H.R. 16373 would make all individually-identifiable information in Government files exempt from public disclosure. Such information could be made available to the public only pursuant to rules published by agencies in the Federal Register permitting the transfer of particular data to persons other than the individuals to whom they pertain. H.Rep.No. 1416 at 13.

Thus, since the Privacy Act expressly defers to the mandatory disclosure provisions of the FOIA, 5 U.S.C. § 552a(b)(2), information which is not exempt under Exemption 6 from disclosure would receive no Privacy Act protection. But if the release of information would "constitute a clearly unwarranted invasion of personal privacy," entitling that information to the benefit of Exemption 6, then that same standard would apply to the Privacy Act's bar against disclosure without "the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b). *Cf. Davidson, The Privacy Act of 1974: Exceptions and Exemptions,* 34 Fed. Bar J. 323, 324 (1975). It is not that the Privacy Act was intended to establish any absolute right of privacy, *cf.* H.Rep.No. 1416 at 10; but for those personal privacy rights which would be invaded in a clearly unwarranted manner by the disclosure of individually identifying information, not only does Exemption 6 of the FOIA relieve that information from obligatory disclosure, but the Privacy Act forbids its disclosure without the affected individual's "prior written consent."

■ Having concluded that the HEW Secretary's proposed disclosure, in an individually identifying manner, of the annual amounts of reimbursements to providers of services under the Medicare Act, would "constitute a clearly unwarranted invasion of personal privacy," and is therefore included within Exemption 6 of the FOIA, the Court further holds that the release of such individually identifying information, without the "prior written consent" of

those individually identified providers, is prohibited by the Privacy Act.

### H. *Plaintiffs' Standing as Individuals Under the Privacy Act*

 The HEW Secretary challenges plaintiffs' standing to invoke the protection of, and obtain relief under, the Privacy Act. The challenge does not raise any issue about the constitutionally-required standing of plaintiffs. *See, e. g., Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72–81, 98 S.Ct. 2620, 2630–2635, 57 L.Ed.2d 595, 610–16 (1978); *Arlington Heights, Ill. v. Metropolitan Housing Develop. Corp.,* 429 U.S. 252, 261–64, 97 S.Ct. 555, 561–563, 50 L.Ed.2d 450, 462–64 (1977); *Simon v. Eastern Ky. Welfare Rights Organiz.,* 426 U.S. 26, 37–45, 96 S.Ct. 1917, 1923–1928, 48 L.Ed.2d 450, 460–64 (1976), and 426 U.S. at 58 and n. 7, 96 S.Ct. at 1934 and n. 7, 48 L.Ed.2d at 472 and n. 7 (Brennan, J., concurring in judgment & dissenting from opinion); *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–2205, 45 L.Ed.2d 343, 354 (1975); *United States v. SCRAP,* 412 U.S. 669, 686–87, 93 S.Ct. 2405, 2415–2416, 37 L.Ed.2d 254, 269–70 (1973); *Data Processing Service v. Camp,* 397 U.S. 150, 151–54, 90 S.Ct. 827, 829–830, 25 L.Ed.2d 184, 187–88 (1970). Instead, the issue raised is one concerning what the Supreme Court has termed "prudential limitations" of standing. *Cf. Arlington Heights, Ill. v. Metropolital Housing Develop. Corp.,* 429 U.S. at 263, 97 S.Ct. at 562, 50 L.Ed.2d at 463; *Warth v. Seldin,* 422 U.S. at 499–502, 95 S.Ct. at 2205–2207, 45 L.Ed.2d at 355–56. The question is whether, as a matter of law, plaintiffs are excluded from the class of individuals whose interests the statute (the Privacy Act) was designed to protect. *Cf. Warth v. Seldin,* 422 U.S. at 499–502, 95 S.Ct. at 2205–2207, 45 L.Ed.2d at 355–56; *Data Processing Service v. Camp,* 397 U.S. at 154–56, 90 S.Ct. at 830–831, 25 L.Ed.2d at 189.

 The Privacy Act was intended to safeguard the privacy interests of individuals. 5 U.S.C. § 552(a)(2) and (b). The term 'individual' is defined as "a citizen of the United States or an alien lawfully admitted for permanent residence." 5 U.S.C. § 552a(a)(2). In choosing the word 'individual' as the object of the Privacy Act's protections, Congress demonstrated its awareness and preference for the narrower scope of that term, rather than the broader scope of the term 'person' to which the FOIA applies. *Raven v. Panama Canal Co.,* 583 F.2d 169, 170–71 (5th Cir. 1978); *Stone v. Export-Import Bank of United States,* 552 F.2d 132, 136–37 (5th Cir. 1977), *cert. denied* 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978). The legislative history of the Privacy Act indicates that the definition of 'individual' by Congress was intended to exclude from the coverage of the Privacy Act those interests of foreign nationals and nonresident aliens, as well as the economic or political interests of fictional persons such as proprietorships, businesses and corporations. *Dresser Inds., Inc. v. United States,* 596 F.2d 1231, 1237–38 (5th Cir. 1979); *Raven v. Panama Canal Co.,* 583 F.2d at 171; *Stone v. Export-Import Bank of United States,* 552 F.2d at 137 and n.7. That same definition of 'individual' appeared in both the House bill, H.R. 16373, as well as in the Senate bill, S. 3418. *See* H.Rep. No. 1416 at 27; S.Rep. No. 1183 at 79, U.S.Code Cong. & Admin.News, pp. 6916, 6993 (1974).

There is no question that from the facial definition of the term 'individual', plaintiffs appear to be included within the scope of the statute's protections. The HEW Secretary, however, points to a guideline fashioned by the Office of Management and Budget ('OMB'), as well as a corresponding HEW regulation. The OMB guideline distinguishes

. . . between individuals acting in a personal capacity and individuals acting in an entrepreneurial capacity (e. g., as sole proprietors) and . . . this definition (and) therefore the Act) was intended to embrace only the former. This distinction is, of course, crucial to the application of the Act since the Act, for the most part, addresses "records" which are defined as . . . "information about individuals" (subsection a(4)).

Agencies should examine the contents of the records in question to determine whether the information being maintained is, in fact, personal in nature. A secondary criterion in deciding whether the subject of an agency file is, for purposes of the Act, an individual, is the manner in which the information is used; *i. e.,* is the subject dealt with in a personal or entrepreneurial role. 40 Fed.Reg. 28948, 28951 (1975).

Similarly, the HEW regulation declares, concerning the definition of 'individual', that

. . . it does not include persons such as sole proprietorships, partnerships, or corporations. A business firm which is identified by the name of one or more persons is not an individual within the meaning of this Part [of the HEW Privacy Act regulations]. 45 C.F.R. § 5b.1(e).

Insofar as plaintiffs' individually identified privacy interests reflect economic, business concerns of their sole-proprietorship-like practices, the OMB guideline and HEW regulation would deny plaintiffs' standing to assert the protections of the Privacy Act. Hence, the legal lines of the issue are unmistakeably drawn. Only if the OMB guideline and HEW regulation are in conflict with the purpose of the statute itself are plaintiffs entitled to rely upon the Privacy Act to prevent the Secretary's proposed disclosure.

■ In order for administrative rules and regulations to have the substantive force and effect of law, they must have some relational basis in legislative, statutory authority. *Chrysler Corp. v. Brown,* 441 U.S. at 301, 304, 99 S.Ct. at 1717–1719, 60 L.Ed.2d at 225, 226; *Westchester Gen. Hosp., Inc. v. HEW,* 464 F.Supp. at 252. They "cannot be legally rootless" and have any binding effect, *Westchester Gen. Hosp., Inc. v. HEW,* 464 F.Supp. at 252, since "they are at most but offspring of statutes." *United States v. Mersky,* 361 U.S. 431, 437, 80 S.Ct. 459, 4 L.Ed.2d 423, 429 (1960). But the OMB guideline, and its corresponding HEW regulation, have a statutory source. Section 6 of the public

law which became the Privacy Act, Pub.L. 93–579, 88 Stat. 1896, 1909–10 (Dec. 31, 1974), expressly provided that "the Office of Management and Budget shall develop guidelines and regulations for the use of agencies implementing the provisions of [the Privacy Act]." Hence, insofar as the OMB guideline and its ensuing HEW regulation purport to implement the Privacy Act, their authority is apparently derived from that statutory source.

■ Besides being grounded in a statutory source of authority, however, administrative rules and regulations which purport to implement a statute must also be consistent with "the statute under which they are promulgated." *United States v. Larionoff,* 431 U.S. 864, 873 and n. 12, 97 S.Ct. 2150, 1256 and n. 12, 53 L.Ed.2d 48, 56 and n. 12 (1977); *United States Pipe & Foundry Co. v. Webb,* 595 F.2d 264, 272 (5th Cir. 1979); *Marshall v. Gibson's Prods., Inc.,* 584 F.2d 668, 677–78 (5th Cir. 1978); *Westchester Gen. Hosp., Inc. v. HEW,* 464 F.Supp. at 252. If the apparent scope of the administrative rule or regulation does not square against the statute's scope of authority, the administrative rule or regulation is of no effect. *Cf. Western Union Teleg. Co. v. FCC,* 541 F.2d 346, 354 (3d Cir. 1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977); *Westchester Gen. Hosp., Inc. v. HEW,* 464 F.Supp. at 252.

The HEW Secretary and other advocates of the OMB guideline, and the corresponding HEW regulation, turn to the legislative history of the Privacy Act as support for the administrative redefinition of 'individual'. In discussing the use of the term 'individual', which was defined the same in both the House and Senate bills, the Senate report declared:

The term *'individual'* means a citizen of the United States or an alien lawfully admitted through permanent residence. This term is used instead of the term "person" throughout the bill in order to distinguish between the rights which are given to the citizen as an individual under this Act and the rights of proprietorships, businesses and corporations which are not

intended to be covered by this Act. This distinction was to insure that the bill leaves untouched the Federal Government's information activities for such purposes as economic regulations. This definition was also included to exempt [from] the coverage of the bill intelligence files and data banks devoted solely to foreign nationals and maintained by the State Department, the Central Intelligence Agency and other agencies for the purpose of dealing with nonresident aliens and people in other countries. S.Rep.No. 1183, at 79, U.S.Code Cong. & Admin.News, pp. 6916, 6993 (1974).

Based on that declaration in the Senate report, OMB and the HEW Secretary contend that the administrative distinction between an individual's (1) personal, nonbusiness information and (2) economic or business information, correctly reflects the legislative intent of the Privacy Act. The former kind of information is prohibited from disclosure without the individual's "prior written consent." The latter information is not.

One district court has accepted that administrative distinction as consistent with the legislative intent of the Privacy Act. *Shermco Inds., Inc. v. Secretary of United States Air Force,* 452 F.Supp. 306, 314–15 (N.D.Tex.1978). While the plaintiff-corporation was plainly excluded from the coverage of the Privacy Act, *id.* at 315, the district court held that its president and major shareholder (the individual plaintiff) was not acting in a personal capacity, but in an entrepreneurial capacity as a proprietorship or business; and therefore did "not have standing . . . under the Privacy Act." *Id.*

A more recent district court decision has rejected the administratively redefined distinction between the information of individuals acting in a personal capacity and the information of individuals acting in a business or economic capacity. *Zeller v. United States,* 467 F.Supp. 487 (E.D.N.Y.1979). The district court scrutinized the same legislative history on which the OMB guideline based its administrative redefinition of 'in-

dividual'. At the same time, the district court recognized its duty to search for, and give effect to, the legislative purpose of the statute. *Id.* at 498. The district court found that "nothing in the statute indicates that Congress intended to apply a personal/entrepreneurial distinction to the type of information covered by the Privacy Act." *Id.* at 499. Accordingly, the district court rejected that administrative distinction. *Id.*

The OMB distinction between an individual's personal and so-called entrepreneurial information has been roundly criticized by legal commentators.

> While not illogical, the distinction would seem to have more viability in the context of the Senate bill than of the statute as enacted, which essentially tracked the House version. "Personal information," as opposed to simply "information," is used only in the introductory section of the Act and not throughout the statute itself, as was done in the Senate bill. The provision granting access to records speaks of "*any*" information pertaining to [the individual] which is contained in the system. "Any" and "personal" are of clearly different scope, and it may be presumed that, if access were to be granted only to personal information, the bill would have so stated, rather than using the much broader term "any" . . . the Act does not indicate the distinction between "entrepreneurial" and "personal" information concerning the individual, which was suggested in the *OMB Guidelines.* Note, *The Privacy Act of 1974: An Overview,* 1976 Duke L.J. 301, 304–05 and n. 24.

The same distinction has been rejected as an administrative artificiality superimposed upon the statutory language and legislative history which are simply and plainly to the contrary.

> An individual has Privacy Act rights in all his or her capacities, including business relationships and activities. The individual who is a scientist, for example, has Privacy Act rights of access to federal agency information prepared by or about him though the activity was con-

ducted on behalf of a profit-oriented affiliate of that person. Corporations lack rights under the text, as they are not "individuals" under the Act's definition. But individuals who practice law, or accountants, or individual participants in actions done on an aggregate basis for profit, have equivalent rights under the Act to those individuals who operate on a non profit basis bearing their own cause through the channels of the government. The Office of Management and Budget attempted to restrict Privacy Act access through its 1975 guidelines to agencies, asserting that an individual who acted in an "entrepreneurial" capacity lost Privacy Act rights by the nature of his or her actions. . . . OMB would determine whether that person's role was entrepreneurial or personal by examining content and the use to which the information is put, e. g. some economic regulation by the agency.

OMB's "entrepreneurial" barrier to individual access will be rejected by the courts if it is tested in an access denial case. Congress did not limit the files coverage to "personal in nature" material, as OMB attempts to do. This omission of a statutory entrepreneurial/personal distinction was intentional, since Congress identified problems with government harassment of individuals in their economic pursuits. O'Reilly, *Federal Information Disclosure*, § 20.05 (1977).

The predicted rejection by the courts of OMB's distinction between an individual's personal information and his economic (or entrepreneurial) information, came true in *Zeller v. United States, supra.* The district court declared:

. . . the statutory language, when viewed in the light of the legislative history and Congress' express findings and statement of purposes, simply does not support the "entrepreneurial" exclusion from the Privacy Act that is embodied in the OMB guidelines . . . Correctly construed, the Privacy Act extends to all information contained within an agency's system of records that pertains to an individual and can be retrieved by the individual's name or by some identifier assigned to him, without regard to the content of the information or whether it pertains to the individual's business activities. The scope of information available under the statute is defined not by the content of the record maintained by the agency, but by the retrieval method used in the agency's system of records. 467 F.Supp. at 499.

In other words, any information stored within an agency's system of records, if retrievable and disclosable in a manner that would identify the individual to whom the information pertains, may not be so released without the individual's "prior written consent."

The same predicted rejection of OMB's redefined distinction must be realized in the case at hand. Legislative history of the Privacy Act reveals an underlying character in its provisions and goals that reflects a congressional intent to protect individuals (as the statute defines them) from having information in the possession of government agencies revealed in a personalized way that individually identifies them, without their prior approval. Such a legislative purpose is entirely consistent with the exemption from mandatory disclosure of information when its disclosure would "constitute a clearly unwarranted invasion of personal privacy" under Exemption 6 of the FOIA.

■ To the extent that the interests of fictional entities like businesses and corporations are excluded from the protection of the Privacy Act, that exclusion is consistent with the same exclusion under Exemption 6 of the FOIA. *See National Parks & Conserve Ass'n v. Kleppe,* 178 U.S.App.D.C. at 388 n. 44, 547 F.2d at 685 n. 44. At the same time, however, Exemption 6 is available as appropriate protection for the privacy interests of sole proprietors and other individuals concerned about disclosure of their "personalized" financial information. *Id.* at 388–389, 547 F.2d at 685–86.

■ Finally, the reason for excluding fictional business entities from the protec-

tion of the Privacy Act is stated in the legislative history: "to insure that the bill leaves untouched the Federal Government's information activities for such purposes as economic regulations." S.Rep. No. 1183 at 79, U.S.Cong. & Admin.News at 6993. The ability of Congress to gather and use information in implementing the Commerce Clause through legislation, and through administrative regulatory authority delegated to the Executive Branch, remains unaffected by the provisions of the Privacy Act. However, information so gathered may not be used in a way that will identify those persons (1) to whom the information pertains, and (2) who are individuals included within the Privacy Act's protection, unless (3) their "prior written consent" is obtained.

There can no longer be any doubt that the Secretary's proposed disclosure of annual Medicare reimbursements amounts, in a way that will identify individual Medicare providers and their amounts of reimbursements, runs afoul of, and therefore is prohibited by, the Privacy Act. Insofar as the OMB guideline and its corresponding HEW regulation, 45 C.F.R. § 5b.1(e), would authorize such a manner of disclosure, they are inconsistent with the statute that they purport to implement; and to that extent they are null and void.

### Conclusion

In conclusion, the Court holds that the Secretary's proposed disclosure of a list of annual reimbursements to individually identified providers of services under the Medicare Act (1) is exempt from required disclosure under the FOIA because it would "constitute a clearly unwarranted invasion of personal privacy"; (2) is prohibited by the Privacy Act from disclosure, without the prior written consent of each affected individual; and (3) if the guidelines and regulations of OMB and HEW would otherwise authorize and allow such disclosure, they are contrary to the Privacy Act and without force and effect.[10] A permanent injunction

on behalf of plaintiffs and the recertified class that they represent will be issued.

---

10. Because the Court's decision is premised upon federal statutory grounds, it is unnecessary for the Court to consider and reach plaintiffs' claims which are based upon federal constitutional grounds.